ESSIE B. FAWCETT, PERSONALLY AND AS ADMINISTRATRIX OF GEORGE D.
FAWCETT, AND AS GUARDIAN OF FRANCES, ANNIE, AND THOMAS
FAWCETT, JR., v. T. G. FAWCETT, FIRST NATIONAL BANK OF
MOUNT AIRY, AND T. G. FAWCETT, MARY ARMFIELD, AND EDITH
F. ANSLEY, EXECUTORS OF MARY LYNFESTER FAWCETT.

(Filed 5 May, 1926.)

1. **Contracts Enforceable at the Death of Either Party—Consideration—**
**Public Policy.**

A contract by the parties that each should sell certain shares of stock
in a bank in which both were officials at his death, upon condition that
either may terminate the agreement upon written notice to the other, is
upon a sufficient consideration not violative of public policy, and enforce-
able according to its terms.

2. **Same—Wills.**

Where a contract expresses itself to be such as to give to the survivor
the right to purchase certain shares of stock of the other at the latter's
death, and is in form an executory contract, it will be construed as an
executory contract and not regarded as subject to the law of wills.

3. **Same—Estates—Afterborn Children.**

Where a paper-writing is construed as an executory contract to take
effect at the death of either party, its terms are not affected by the fact
that the condition of the estate was changed by children born of the de-
cedent after its execution, under the law relating to wills.

4. **Wills—Afterborn Children—Revocation—Statutes.**

While afterborn children not provided for in the will of their deceased
parent my claim by inheritance their part of the estate, C. S., 4135, 4169,
it does not amount to revocation of the entire will.

5. **Contracts—Revocation—Conditions—Notice to Terminate.**

Where a mutual contract for the sale of shares of stock by one of the
parties to the other at the death of either, provides that each thereof may
terminate it upon written notice to the other, it will be enforced accord-
ing to its terms, and as an executory contract may be enforced when such
notice of its termination has not been given or affected by the change in
the circumstances of the parties.

6. **Contracts—Enforceable at Death of Party—Fraud—Evidence.**

Where the parties have agreed that each would sell to the survivor his
certain shares of bank stock at a fixed price, evidence that the survivor
was a confidential adviser of the deceased and as his executor advised his
widow taking the estate of her deceased husband, to sell at the price so
fixed by the contract, to which she agreed, is not sufficient evidence of
fraud on the part of the survivor.

7. **Courts—Jurisdiction—Probate—Actions.**

A lost will can only be restored as the law prescribes, and the courts
cannot acquire jurisdiction over the subject-matter otherwise.

APPEAL by plaintiff from *Lyon, J.,* at September Special Term, 1925, of FORSYTH.

George D. Fawcett and T. G. Fawcett were brothers, each owning stock in the First National Bank of Mount Airy. On 11 August, 1908, they entered into the following contract:

"Whereas, upon the death of either party of this contract, it is the desire and will of each and both that any and all shares of stock in the First National Bank of Mount Airy, N. C., owned by either of the parties of this contract, at the time of death, shall become the property of the survivor, upon a par basis, and this instrument is a contract made by each and both parties hereto, to sell to the survivor said stock at par, and to give to the survivor five years during which to make payment for said stock, to be divided into five equal annual payments. And this contract shall be binding upon the administrators, executors or assigns of either party. This contract may be canceled by either party upon a change of mind, circumstances or sentiment with proper notice to the other party hereto in writing."

George D. Fawcett died intestate on 20 May, 1920, leaving as his heirs and distributees his widow and three children. Soon afterwards T. G. Fawcett took charge of the intestate's bank stock, had it retired or canceled, and accepted from the bank other certificates of stock issued to himself in lieu thereof.

On the trial T. G. Fawcett testified that he was cashier and that his brother had been president of the bank; that his brother had held $29,250 in stock of the par value of $100; that of this amount he had obtained from his mother $15,625, for which he had given her his note secured by a deposit of the stock. He testified that he had executed and delivered to Essie B. Fawcett, widow and administratrix of George D. Fawcett, his notes for the stock he had taken up pursuant to the agreement and had delivered to her the shares of stock as collateral security. He said that the certificates originally issued to his brother had been endorsed by Essie B. Fawcett, and that he had in all respects complied with the contract between him and his brother.

George D. Fawcett and Essie Fawcett were married in 1907. Their first child was born in May, 1909, the second in September, 1912, and the third in July, 1915.

The court instructed the jury if they believed the evidence to answer the first issue "No" and the second issue "Nothing." Thereupon the following verdict was returned:

1. Are the plaintiffs the owners and entitled to the possession of the stock in the First National Bank, described in the complaint? Answer: No.

2. What sum, if any, are the defendants indebted to the plaintiffs?
Answer: Nothing.

Judgment and appeal by the plaintiff for error assigned.

*R.. C. Freeman, Holton & Holton for plaintiffs.*
*Carter & Carter, Swink, Clement & Hutchins for defendants.*

ADAMS, J.   The appellant contends that the alleged contract between
George D. Fawcett and T. G. Fawcett should have been excluded be-
cause it was against public policy, unsupported by a valuable considera-
tion, and therefore void and of no effect.   To this. position we cannot
give our assent.   Any benefit to the promisor or any loss or detriment
to the promisee is a sufficient consideration to support a contract.   In
*Brown v. Ray,* 32 N. C., 72, it is said that to make a consideration it is
not necessary that the person giving the promise should receive or expect
to receive any benefit; it is sufficient if the other party be subjected to
loss or inconvenience.   A promise for a promise, a right, interest, or
benefit accruing to the one party, or forbearance, detriment, or loss
given, suffered or undertaken by the other, is sufficient to constitute a
valuable consideration.   *Institute v. Mebane,* 165 N. C., 644; *Brown v.
Taylor,* 174 N. C., 423; *Mfg. Co. v. McCormick,* 175 N. C., 277;
*Exum v. Lynch,* 188 N. C., 392.   Nor do we find in the contract any-
thing inconsistent with the doctrine of public policy.   It has been said
that public policy is an unruly horse astride which one may be carried
into unknown paths; and observant of the danger the courts as a rule
are not alert to denounce a transaction as invalid on the ground that it
is against public policy, unless the transaction contravenes some posi-
tive statute or some established rule of law.   A contract, for example,
whereby A agrees to make a will in favor of B, or to refrain from mak-
ing a will, is not of itself void on any ground of public policy; and a
contract which is to be performed at the death of one of the parties is
not for this reason illegal.

The agreement in question is not open to the objection that it is a
testamentary disposition of property.   *Clayton v. Liverman,* 29 N. C.,
92; *Egerton v. Carr,* 94 N. C., 649; *Phifer v. Mullis,* 167 N. C., 405;
*In re Southerland,* 188 N. C., 325.   It has only one witness and pur-
ports to be, not a will, but an executory agreement.   Six times it is
specifically designated a "contract"; evidently it is "a present contract
presently executed," the performance of which is deferred until the
death of one of the parties.   In *Green v. Whaley,* 271 Mo., 636, 653, it is
said that a contract of this character resembles an agreement between
two persons to make mutual wills, or to devise property in a certain
way, or to leave it to a person at the death of the owner without desig-

nating in what particular way it is to vest in the party to whom it is given; and in *McKinnon v. McKinnon,* 56 Fed., 409, the Court said that such a contract is an executory agreement which determines the rights of the parties *inter se* and provides what disposition shall be made of the property on the happening of a certain event—a contract which at the promisor's death will be specifically enforced in equity or become the foundation for an action at law. It is upon this principle that a negotiable instrument may be made payable after death or a contract enforced which provides that compensation shall be made after death for services rendered in the lifetime of the promisor. *Lipe v. Houck,* 128 N. C., 115; 2 Page on Contracts, sec. 865; Daniel on Neg. Ins., sec. 46; *Koslowski v. Newman,* 3 L. R. A., 704; *Knell v. Cadman,* 14 L. R. A., 860; *Goff v. Supreme Lodge,* 37 L. R. A. (N. S.), 1191; *Buchtel College v. Chamberlain,* 84 Pac., 1000; 6 R. C. L., 710; 13 C. J., 271(60). See, also, *East v. Dolihite,* 72 N. C., 562; *Stockard v. Warren,* 175 N. C., 283; *Burch v. Bush,* 181 N. C., 125.

In our opinion the contract sued on is therefore neither void nor illegal. It contains a stipulation, however, by which the appellant contends that it may be avoided: "This contract may be canceled by either party upon a change of mind, circumstances or sentiment with proper notice to the other party hereto in writing." There is no evidence that George D. Fawcett gave a notice written or verbal of his purpose or desire to cancel the contract; but the appellant says that the birth of three children wrought a change in the intestate's circumstances which supplied the written notice and made void the agreement.

Under our statute law a will is not revoked by any presumption of an intention on the ground of an alteration in circumstances or by the birth of a child after the will is made, although children subsequently born are entitled to share in the estate. C. S., 4135, 4169. But, as we have said, the instrument in controversy is an executory contract, not a testament; hence the appellant's contention must be determined by the law of contracts. A contract may be discharged by performance; by a breach of such a nature as to justify the innocent party in treating it as rescinded; by fraud, mistake, or duress; by release; by renunciation; by parol agreement; by accord, novation, cancellation, alteration, merger, or impossibility of performance. 3 Williston on Contracts, sec. 1793 *et seq.;* Page on Contracts, sec. 2447 *et seq.* None of these conditions is pleaded or established by the evidence; and mere change in the circumstances of the parties is not sufficient to work a cancellation. The parties to a bilateral contract may agree to rescind it in a particular way; for as there must be mutual assent to form a contract, there may be mutual assent as to the method by which it may be rescinded. That is, as the parties are bound by their agreement, so by their agreement they

may be loosed from their mutual tie. Clark on Contracts, 606. Here the method of revocation was agreed on; by the express terms of the contract there must have been not only a change of mind, or circumstances, or sentiment, but "proper notice to the other party hereto in writing." Such notice was not given and presumptively there was no change that made notice necessary or desirable.

In her replication the plaintiff alleges that T. G. Fawcett obtained her intestate's shares of stock by fraud and undue influence; that he became her sole confidential adviser and instructed her in the management of the estate; that he procured the cancellation of this stock, caused certificates therefor to be issued to himself, and made on George D. Fawcett's note the following entry: "$14,300.00 stock to T. G. Fawcett, $1,325 stock to estate of George D. Fawcett, dated 28 May, 1920, and that thereupon the aforesaid note of $15,625, subject to the credits appearing thereon and set forth herein above, was turned over to Essie B. Fawcett, stamped paid, 29 May, 1920."

The appellant offered to testify as follows: "He had me transfer this stock. I was told to sign and I signed. T. G. Fawcett told me to do it. He said that he was paying me what the stock was worth; that my husband had loaded up the bank with a great many Liberty Bonds, and they would have to lose on that, and he had loaned large sums of money to people out of town, and they were going to lose; and he was buying it in protection of me; in case anything happened at the bank I would not be liable for any loss; that he was buying it as a protection to me." She offered also the following testimony of J. C. Hollingsworth: "I had nothing to do with the management of George D. Fawcett's estate; I suppose Mrs. Fawcett did, as she was administratrix and guardian for her children. T. G. Fawcett was advising her and helping her with it. T. G. Fawcett told me that he could help her and save attorneys' fees and commissions, and he would do it. She took his advice."

The proposed evidence was excluded and the appellant excepted on the ground that it tended to show fraud in the transfer of her intestate's stock. The plaintiff's allegations do not impute to T. G. Fawcett the performance of any act not authorized by the contract; for according to her evidence he made no representation as an inducement to her transfer of the bonds which relieved her as executrix from a strict compliance with the agreement. The representation upon which she chiefly relies is his statement that the stock "was worth par," whereas she afterwards learned that a few shares had been sold for $1.85. This, however, could not vary the contract. The parties agreed that when either of them died the shares of the deceased should "become the property of the survivor upon a par basis." Moreover, "this instrument is a contract made by each and both parties hereto to sell to the survivor said stock

at par"; and "this contract shall be binding upon the administrators, executors or assigns of either party." Whether the actual value of the stock was above or below par is immaterial; the price was fixed by the parties and in either event the appellant is bound by the agreement. As she had no right to demand any amount in excess of the contract price she cannot be heard to say that she was deceived by T. G. Fawcett's representation as to the value of the stock. Her allegations and her evidence therefore are not sufficient to show actionable deceit or false pretense. It may be observed that the alleged representations were made on or about 28 May, 1920, and the present suit was brought 7 April, 1923; also that there is no evidence of the plaintiff's offer to return the notes or the stock she received at the time her intestate's shares were transferred. *Martin v. Cook,* 59 N. C., 199. The record does not show that an issue as to fraud was tendered, and we are not able to see how the plaintiff was prejudiced in respect to this contention.

On cross-examination T. G. Fawcett testified: "I told her (appellant) George drew a will and I drew a will at the same time, but the will was never located. I read the will. If I remember right, he drew mine and drew his, and he said the thing to do was to write them in our own handwriting; that was better than to have a typewritten will; that has been fifteen or sixteen years ago, and was not far from the date of the execution of Exhibit 'A.' It was after his children were born. He left everything to his wife, just like I did. I imagine they had a child at that time. Both wills were written at the bank. I think Mrs. Fawcett's sister witnessed both of them. I do not know what became of George's will; I never saw it in the bank; he had it in his private papers; he never locked the box he had his papers in; it was left open. His will was in his own handwriting. He suggested to me that we should write them in our own handwriting; I saw him there working with it; he said it ought to be written out. I wrote one just like his in my own handwriting. I don't know how many of his children had been born then; he gave all his property to his wife. After George died I went to his home to talk to his widow; they lived next door to me. I carried the box there, and looked for the will. I said, I believed he had a will, because I knew he made a will at one time, and I said at the time the box was opened, 'If he had it, it ought to be right here.' I was very much surprised at not finding a will. And I expressed my surprise then."

On motion this testimony was withdrawn from the jury and the appellant excepted. If George D. Fawcett made a will it has been lost or destroyed; at least it has not been produced. If purposely destroyed by the testator it was revoked. *Hise v. Fincher,* 32 N. C., 139; *White v. Casten,* 46 N. C., 197; C. S., 4133. If lost, it can be restored only in the way prescribed by law, and its contents cannot be proved in a col-

lateral action or proceeding. The rejected evidence was incompetent. The difference between the probate of a will which is produced and one which is lost relates to the nature and quantity of the evidence required to prove it; but the loss of the will does not change the jurisdiction of the court. *McCormick v. Jernigan,* 110 N. C., 406; *Ricks v. Wilson,* 154 N. C., 282. His Honor, we think, very properly struck the objectionable evidence from the record.

The remaining exceptions are without merit and call for no discussion. We find

No error.